# In the United States Court of Federal Claims

## No. 07-4261L
### (Filed: June 27, 2013)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| McCANN HOLDINGS, LTD., | \* | Fifth Amendment Taking; Rails-to-Trails; 16 U.S.C. § 1241 et seq.; Just Compensation; Valuation; Severance Damages; Buffering; Berming; Cost to Cure; Loss of Access. |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| v. | \* | |
| | \* | |
| THE UNITED STATES, | \* | |
| | \* | |
| Defendant. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Mark F. (Thor) Hearne, II, Lindsay S.C. Brinton, and Meghan S. Largent, Arent Fox LLP, 112 S. Hanley Road, Suite 200, Clayton, MO 63105; Debra J. Albin-Riley and Joseph L. Cavinato, III, Arent Fox LLP, 555 West Fifth Street, 48th Floor, Los Angeles, CA 90013, for Plaintiff.

Ignacia S. Moreno, Mark Barron, William Shapiro, and Carol L. Draper, United States Department of Justice, Environment & Natural Resources Division, Natural Resources Section, Washington, DC 20044, for Defendant.

---

## OPINION AND ORDER

---

**WILLIAMS,** Judge.

This Fifth Amendment taking case comes before the Court following a trial on damages.[1] Plaintiff seeks $3,177,365 in damages stemming from the imposition of a recreational trail across

---

[1] Plaintiff filed a complaint on June 27, 2007, as one of seven plaintiffs in Bird Bay Executive Golf Course, Inc. v. United States (No. 07-426L). Bird Bay was consolidated with Rogers v. United States (No. 07-273L) and Bay Plaza v. United States (No. 08-198L) for proceedings on liability. This Court issued a liability decision in November 2009, finding the Government liable for taking eight properties, including McCann North. Rogers v. United States, 90 Fed. Cl. 418, 433 (2009).

In June 2012, the plaintiffs in the consolidated cases moved to sever the claims of McCann Holdings, Ltd. from the consolidated claims in Rogers (No. 07-273L), Bird Bay (No. 07-426L), Bay Plaza (No. 08-198L), Breda v. United States (No. 10-187L), and Murphy v.

its property pursuant to the Rails to Trails Act.  Specifically, Plaintiff seeks $1,267,200 for the encumbrance of the trail and $1,910,165 in severance damages for the diminution of the property's value because of impaired access and the need to berm the property.[2]  Defendant asserts that compensation should be limited to the encumbrance, which it claims is properly valued at $925,000.  The Court awards just compensation in the amount of $3,177,365 representing $1,267,200 for the encumbrance plus severance damages of $755,165 for buffering and/or berming and $1,155,000 for lost access.

## **Findings of Fact**[3]

Plaintiff's 306-acre property, McCann North, is located within Palmer Ranch, a large mixed-use residential community in Sarasota, Florida.  Tr. 40-42, 112; PX 5, PX 6.  The land was vacant and undeveloped in 2004.

On April 2, 2004, the Surface Transportation Board ("STB") issued an order authorizing a "rail-to-trail" conversion of a railroad right-of-way in Sarasota County, measuring 12.43 miles long.  PX 1 (STB Docket No. AB-400 (Sub-No. 3X, Apr. 2, 2004 Decision)).  Plaintiff's land abuts this right-of-way, and the conversion resulted in a recreational trail easement measuring 50 feet across and approximately one mile long on the western edge of Plaintiff's property, for a

---

United States (No. 10-200L).  On August 13, 2012, the Court granted the motion and directed the Clerk to assign No. 07-4261L to the action of McCann Holdings, Ltd.  Accordingly, this opinion concerns only the damages related to one property, McCann North, and "Plaintiff" in this opinion refers to McCann Holdings, Ltd.

[2] Plaintiff initially sought $1,280,000 for the encumbrance of the trail, representing 6.4 acres of land valued at $200,000 per acre.  Pl.'s Post-Trial Br. 16.  However, Plaintiff reduced this demand to $1,267,200 because both parties agreed that the Government took 99% of the value of the land underlying the corridor.  DX 1 (US Ex. 000001-047 to 049); see also Tr. 494-95; Pl.'s Post-Trial Reply Br. 9.

[3] Plaintiff initially sought $1,949,600 in severance damages, representing $1,155,000 for lost access and $794,600 for buffering/berming.  In its post-trial reply brief, Plaintiff reduced its claim for buffering/berming to $755,165.  Pl.'s Post-Trial Reply Br. 24.  Plaintiff did not adjust its claim for lost access.

[3] These findings of fact are derived from the record developed during a two-day trial on damages, which related only to the McCann North property.  Additional findings of fact regarding diminution in value and cost to cure the impact of the taking are set forth in the Discussion section.  The Court conducted a site visit of the property and the trail with counsel for both parties.  The Court uses "PX" and "DX" to designate exhibits admitted during trial and "Tr." to cite trial testimony.  Citations to exhibit page numbers are to the Bates number assigned to a given page.

total encumbrance of 6.4 acres.  Tr. 113.  As of April 2, 2004, the date of the taking, the property was zoned open use estate-1 and had a maximum density of five residential units per acre. Joint Stipulations of Fact ("Stip.") ¶ 20; Tr. 60; DX 1 (US Ex. 000001-029).  No railroad traffic had moved over this railroad line since March 2002.  Rogers v. United States, 90 Fed. Cl. 418, 421 (2009).

After the STB authorized the conversion, the railroad tracks and ties were removed, the rail line was graded, and the county paved an asphalt trail.  The resulting trail is known as the Legacy Trail.  There are benches and public restrooms at various points along the trail and trail heads that afford public access.  Sarasota County estimates that between 125,000 and 150,000 people use the trail annually.  Tr. 123-24.  A plaintiff in Rogers v. United States, No. 07-273L, whose residence abuts the trail testified that noise, traffic, crime, and instances of trespass increased because of the trail, and Plaintiff submitted analyses indicating that the fair market value of properties adjacent to a corridor are 16-28% lower than properties off the corridor.  Tr. 348-55; PX 13.

McCann North is located south of Silver Oak and The Isles, upscale residential communities, and north of Oscar Scherer Park, a Florida State Park.  Tr. 41-42, 66-67; DX 5.[4] An aerial map of McCann North and its immediate surroundings is attached to this opinion as Appendix A.  There is a creek along the eastern boundary and residential development to the west.  McCann North is within the Urban Service Boundary of Sarasota County, the area in the county served by utilities -- sewers, electricity, and water.  Tr. 53.  Sarasota County expects growth to occur in the Urban Service Boundary.  Tr. 54.

McCann North is adjacent to the Palmer Ranch Development of Regional Impact ("DRI"), which imposes obligations on developers of large tracts concerning traffic, road use, environmental implications, and permissible uses.  Tr. 543-45.[5]  The Palmer Ranch DRI requires developers to submit habitat maintenance plans, adhere to a water management plan, employ best practices for erosion and sediment control, connect recreational areas for pedestrian and bike access, and provide buffers in designated areas.  See PX 7.  Mr. Culverhouse, a real estate developer and the owner of McCann Holdings, Ltd., a Florida limited partnership based in Sarasota, testified that developments within McCann North could be added to the Palmer Ranch DRI, which would allow a developer to use the existing DRI's permits and studies.  See Tr. 418-19.

Sarasota County requires developments to have two points of access.  Tr. 139-41.  The access points can be on the same road as long as they are spaced at least 1,320 feet apart.  Id. Before the taking, McCann North had one preexisting point of access, Honore Avenue.  Tr. 142,

---

[4] McCann South, a 600-acre property also owned by Plaintiff, is directly south of McCann North.  Oscar Scherer Park is south of McCann South.  Tr. 39-40.

[5] Florida law requires a large development which, "because of its character, magnitude, or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county," to have guidelines and standards for development, referred to as a DRI.  Fla. Stat. § 830.06(1) (2011).

566.   The installation of the trail did not affect McCann North's access to Honore Avenue, a major north-south roadway.  PX 9.  Bay and Preymore Streets, which run east-west, are located to the west of the property, and neither street abutted McCann North before the taking.  Using Preymore and Bay Streets to provide access to McCann North would have required an extension of these roadways over the corridor both before and after the conversion of the railroad corridor to a trail.  Tr. 428, 432-35.  Additionally, western access was critical to provide a means of reaching the beach, US Route 41, and Pine View School, a nationally-recognized school.  Tr. 138-39, 400.

Before the imposition of the trail easement, Mr. Culverhouse had discussed extending Bay and Preymore streets to McCann North with county officials.  See Tr. 399, 435, 442.  In September 1999, Sarasota County obtained a dedicated right-of-way to the land necessary to extend Preymore Street to McCann North.  Tr. 443-46; PX 19.  In Mr. Culverhouse's view Sarasota County would have extended Preymore Street to McCann North based on his agreement with the county.  He testified:

> THE COURT: . . . if Bay Street ends at Pine Ranch East, there's a yellow mark on the map, is there not?  My question is that means there's no road where that yellow mark is between Pine Ranch East and --

> THE WITNESS: There is not today.

> . . .

> However, there is an agreement between the county and myself that the county will acquire a 50-foot right-of-way and they will build the road from 41 to my property.

> THE COURT:  . . . So the answer is there's no road there now?

> BY MR. SHAPIRO:

> Q.     Is that correct, Mr. Culverhouse?

> A.     There is no road, but I have the right to have the county build a road.

> Q.     And when did you get that right?

> A.     I got that right in 1999, renewed again after.

> Q.     Mr. Culverhouse, so the county, if I'm understanding you correctly, the county is in the process then of or has plans to expand the Bay Street to the east across the Legacy Trail to your property?

> A.     No, they locked my gate. No.

> Q.     So there's no agreement to expand Bay Street across the trail?

> A.     Across the trail, how could they?  Tell me who I negotiate with.  I've got two parties.  Where's the third? Is it a train line in Seattle?

. . .

A.  [W]e were planning as long as Mr. Fay owned Gulf Railroad, the county and I were planning to have Bay extended from the bottom of my property, depending on how I angled [Honore] and the county would build -- would acquire a 50-foot right-of-way they had already purchased or were in the process of purchasing Dennis' property, and they would upgrade Bay to county standards to 41, so that was what we were doing and that's what I was planning, then I would never -- I would never ever ever have to take Honore' and build it like that.  Isn't that ludicrous?

Q.  Mr. Culverhouse, you're talking about some sort of an agreement with the county.

A.  Yes, sir.

Tr. 434-36.

Mr. Culverhouse's testimony is supported by the plats for the subdivision immediately to the west of McCann North and directly south of Preymore Street.  PX 19.  A plat for a development known as Bay Oaks Estates dated 1991, depicts a 30-foot right-of-way dedicated to Sarasota County by the developer of Bay Oaks Estates from the terminus of Preymore Street to McCann North.  PX 19 ("34' ADDITIONAL RIGHT-OF-WAY DEDICATED TO SARASOTA COUNTY BY THIS PLAT"); Tr. 443-45.  Mr. Culverhouse testified it was his understanding that as of 1991, the county had a dedicated access from the terminus of Preymore Street to the edge of McCann North and would not have needed to condemn any other properties to extend Preymore Street to McCann North.  Tr. 445-46.

Additionally, Mr. Culverhouse testified that when the original railroad easement was still in effect, he had an oral agreement with the county, under which the county would acquire a 50-foot right-of-way and extend Bay Street to McCann North.  Tr. 434-36; PX 18 ("ADDITIONAL R/W DEDICATED TO SARASOTA COUNTY BY THE PLAT").  A plat for a residential subdivision west of McCann North shows that the county had a dedicated right-of-way for the land between the terminus of Bay Street and the corridor as of August 1999.  PX 18; Tr. 448-49.  Mr. Culverhouse testified that due to the trail he could no longer extend Bay and Preymore Streets because there was a possibility that rail service could return, and he did not have an agreement with the railroad to allow him to build across the easement.  Tr. 404.  Mr. Culverhouse stated:  "I can't have unfettered access because the railroad can come back.  I don't have an agreement.  The county can't give me an agreement.  The railroad can come back at any time.  The railroad comes back, they can make me build a bridge for billions of dollars."  Tr. 404.

5

**Discussion**

**Jurisdiction**

The Tucker Act confers jurisdiction on this Court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). Here, Plaintiff alleges a taking under the Fifth Amendment of the United States Constitution, which is a money-mandating provision. Schooner Harbor Ventures, Inc. v. United States, 569 F.3d 1359, 1361-62 (Fed. Cir. 2009).

**Legal Standards Governing Just Compensation**

As established in this Court's liability decision, Plaintiff's property was taken when the railroad easement on Plaintiff's land was converted to a recreational trail easement under the Rails to Trails Act. Rogers, 90 Fed. Cl. at 433. The Act preserves shrinking rail trackage by converting unused railroad rights-of-way to recreational trails. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5-6 (1990); see also 16 U.S.C. § 1241 et seq. (2006). In a rails-to-trails case, a taking can occur when "reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." Caldwell v. United States, 391 F.3d 1226, 1228 (Fed. Cir. 2004) (citing Preseault v. United States, 100 F.3d 1525, 1543 (Fed. Cir. 1996) (en banc)). Specifically, in a rails-to-trails case, a taking, if any, occurs when the government issues a Notice of Interim Trail Use or Abandonment ("NITU"). Id. at 1233-34. The Rails to Trails Act stops a common law abandonment from occurring when the railroad right-of-way is converted to a recreational trail. Rogers, 90 Fed. Cl. at 428 (citing Caldwell, 391 F.3d at 1229). As the Federal Circuit explained, "[a]bandonment is suspended and the reversionary interest is blocked 'when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)' of the Trails Act . . . ." Barclay v. United States, 443 F.3d 1368, 1373 (Fed. Cir. 2006) (quoting Caldwell, 391 F.3d at 1233). The imposition of a recreational trail creates a new easement for a new purpose across the landowner's property, which constitutes a taking entitling the landowners to just compensation. Preseault, 100 F.3d at 1543. Under the Trails Act, through a process known as "railbanking," once the railroad and trail operator reach an agreement, "the STB retains jurisdiction for possible future railroad use and the abandonment of the corridor is blocked 'even though the conditions for abandonment are otherwise met.'" Caldwell, 391 F.3d at 1229 (quoting Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd., 158 F.3d 135, 139 (D.C. Cir. 1998)). Because the STB retains jurisdiction and possible abandonment is blocked, the railroad retains an interest, and rail service can be restored to the corridor.

Just compensation should be carefully tailored to the circumstances of the case, and this determination typically requires expert testimony. The Court has discretion in adopting a methodology that awards a takings plaintiff just compensation. Otay Mesa Prop., L.P. v. United States, 670 F.3d 1358, 1369 (Fed. Cir. 2012); Washington Metro. Area Transit Auth. v. United States, 54 Fed. Cl. 20, 36 (2002) (when "dealing with a thorny issue of valuation, it is for this court to 'synthesize in its mind . . . the record before it, determine to what extent opinion

evidence rested on fact, consider and weigh it all, and come up with figures supported by all the evidence . . .'") (quoting United States v. N. Paiute Nation, 183 Ct. Cl. 321, 346 (1968)).  The landowner "is entitled to be put in as good a position pecuniarily as if his property had not been taken.  He must be made whole but is not entitled to more."  Olson v. United States, 292 U.S. 246, 255 (1934); see also Kimball Laundry Co. v. United States, 338 U.S. 1, 20 (1949).

"Where the property interest permanently taken is an easement, the 'conventional' method of valuation is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed.'"  Otay Mesa, 671 F.3d at 1364 (quoting United States v. Va. Elec. & Power Co., 365 U.S. 624, 632 (1961)).  In addition to the value of the property actually taken, just compensation includes severance damages -- the diminution in value in the owner's remaining property resulting from the taking.  United States v. Miller, 317 U.S. 369, 376 (1943) ("If only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire track.");  see also United States v. Grizzard, 219 U.S. 180, 185 (1911) ("When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account.").  Plaintiff has the burden of proof with respect to severance damages and must offer evidence that the remainder lost market value.  Miller v. United States, 223 Ct. Cl. 352, 383-84 (1980); see also Hendler v. United States, 175 F.3d 1374, 1383 (Fed. Cir. 1999); United States v. Honolulu Plantation Co., 182 F.2d 172, 179 (9th Cir. 1950); see generally Moore v. United States, 54 Fed. Cl. 747, 753-54 (2002).

The cost to cure -- or the cost of mitigating damages caused by the taking -- provides an alternative means of quantifying severance damages.  It is well established that "[w]hen the cost of curing the injury to the remainder is less than the outright diminution in its value uncured, the government may pay the cost of cure."  United States v. 2.33 Acres of Land, 704 F.2d 728, 730 (4th Cir. 1983) (citing United States v. Dickinson, 152 F.2d 865, 870 (4th Cir. 1946), aff'd, 331 U.S. 745 (1947)).  As the author of one treatise has explained:

> It must be cautioned that the cost to cure, while admissible for the purpose of establishing just compensation, does not create individual rights to damages.  Rather, it is merely evidence of the effect of the taking on market value, and therefore on diminution in value of the remainder.  The cost to cure approach is available only to the extent that the actual cost to cure is less than or equal to the diminution in value of the remainder, such that evidence of the cost to cure is admissible only when the cost to cure is no greater than the diminution in value of the remainder if the condition is left uncured.

4A Julius L. Sackman, Nichols on Eminent Domain § 14A.04[2][a] (3d ed. 2013) (footnotes omitted).

Additionally, the Federal Circuit has held "that once a plaintiff has established that a taking occurred, it is entitled to compensation for its costs in preventing the damage caused by government actions."  Vaizburd v. United States, 384 F.3d 1278, 1286 (Fed. Cir. 2004).  Such damages are compensable when they are reasonable.  Id.; see also United States v. Dickinson, 331 U.S. 745, 750-51 (1947) (holding that if erosion caused by taking was preventable, plaintiff could recover costs to prevent further erosion); Ridge Line, Inc. v. United States, 346 F.3d 1346, 1358-59 (Fed. Cir. 2003) (recognizing that if increased storm water flowages onto plaintiffs'

property constituted a taking, damages could be assessed based on the cost of constructing flood control measures).

## The Value of McCann North Before the Taking

The parties do not dispute that the measure of just compensation in this case is the difference in the value of McCann North before and after the taking.  Rather, the parties disagree on what the before value was and what effect the taking had on the property.  Plaintiff's appraiser found that the value of the property before the taking was $200,000 per acre and determined that Plaintiff was entitled to $3,229,600 in compensation for the land encumbered, and severance damages to mitigate the loss of road access and the cost of buffering.  Defendant's expert appraised McCann North at $145,000 per acre before the taking, and limited compensation to payment for the 6.4 acres encumbered by the trail -- a total of $925,000.

In a before-and-after analysis, the value attributed to the property is ascertained as of the date of the taking.  Miller, 317 U.S. at 374.  Both experts properly used April 2, 2004, the date of the NITU, as the date of the taking.  In 2004, there was a high demand for real estate in the Palmer Ranch area, and prices were increasing.  Tr. 70 ("[A]s far as the market for residential land, it was increasing on a daily basis . . . It was in high demand, and increasing in value."); Tr. 71 (quoting a portion of Mr. Underwood's deposition wherein he testified that housing prices increased by 28.7% from 2003 to 2004, in Sarasota County); Tr. 408; DX 1 (US Ex. 000001-021) (Mr. Underwood's appraisal report, stating "[a]s of mid-2004, the real estate boom in the county is well underway.").

### Plaintiff's Expert's Valuation

Plaintiff's expert, Chad Durrance, appraised McCann North according to the highest and best use, and presumed that it would be developed as a residential planned community.  Tr. 29, 62-63.[6]  In his analysis, the before condition was the full 306-acre property without any easement.  Tr. 73-74.  In appraising the property, Mr. Durrance viewed McCann North's adjacency to the Palmer Ranch DRI as an asset because it would provide the developer with the flexibility to include McCann North within the DRI and avoid conducting engineering, planning, and environmental studies because the studies previously conducted for the Palmer Ranch DRI would apply.  Tr. 49.

---

[6] The Court admitted Mr. Durrance as an expert in "the practice of appraisal valuation of real estate in Sarasota, Florida."  Tr. 20.  Mr. Durrance is the president of Durrance & Associates, P.A.  He is a professional real estate appraiser, is licensed in the state of Florida as a General Appraiser, and holds a "Member of the Appraisal Institute" designation.  Tr. 12-14.  Mr. Durrance primarily appraises properties on the west coast of Florida.  Tr. 16.  He has appraised over 1,000 properties, including properties within Sarasota County, and has testified about the value of property taken in eminent domain proceedings approximately one dozen times.  Tr. 16-19.  Mr. Durrance has a Bachelor's degree from the University of Florida, with a major in Real Estate and Urban Land Studies.  PX 2.

While McCann North was not within the boundaries of the Palmer Ranch DRI in April 2004, a DRI is subject to amendment, and Mr. Culverhouse and Mr. Durrance expected that Sarasota County would approve adding McCann North to the Palmer Ranch DRI. Tr. 48, 421-22. Both parties' experts appraised McCann North as similar to properties within the DRI. DX 1 (US Ex. 000001-039) ("Sales A-2 and A-3 are located in the Palmer Ranch DRI, like the subject . . . .").

Mr. Durrance utilized a technique known as comparable sales analysis to determine the value of McCann North. Tr. 20. This sales comparison approach is based on the premise that a knowledgeable buyer would not pay more for a given property than other buyers paid for similar properties. In a comparable sales analysis, the appraiser identifies the salient characteristics of a given property and then finds sales of similar properties in the market that occurred close to the date of value. Tr. 21-22; Appraisal Institute, The Appraisal of Real Estate 297 (13th ed. 2008).[7] The appraiser analyzes the sales of the comparable properties and uses them to approximate the value of the subject property. Tr. 21-22.

Mr. Durrance compared McCann North with six vacant properties and focused on six salient characteristics -- market conditions, location, size, zoning/future land use entitlements, environmental lands and easements/encumbrances. Tr. 89-92; PX 12, PX 15. He used sales spanning a month prior to the taking and over a year-and-a-half after the taking. He rated the comparison properties as similar, slightly superior, superior, inferior, and slightly inferior to McCann North with respect to each characteristic. If the comparison property was superior to McCann North, then Mr. Durrance valued McCann North at a lower price per acre. If the comparison property was inferior to McCann North, then he appraised McCann North at a higher price.

---

[7] In its post-trial briefing, Plaintiff cited The Appraisal of Real Estate and J.D. Eaton, Real Estate Valuation in Litigation (Stephanie Shea-Joyce, ed., Appraisal Institute 2d ed. 1995). Neither party's expert cited or mentioned these treatises in his appraisal report, and neither expert discussed these treatises at trial. While Plaintiff relied on these treatises, Defendant did not address these in its post-trial brief. On August 24, 2012, the Court issued a Notice to the parties identifying this gap in the record. On September 4, 2012, the parties filed a Joint Response to the Court's Notice, agreeing that Real Estate Valuation in Litigation and The Appraisal of Real Estate are reliable authorities on the subjects of real estate valuation and appraisal methodology. The parties filed a joint appendix that, for each book, includes a copy of the cover page, table of contents, and sections the parties had referenced in their post-trial papers. The Court accepted the parties' representations and added the joint appendix to the record. All references to Real Estate Valuation in Litigation and The Appraisal of Real Estate in this opinion are in the joint appendix.

J.D. Eaton was Assistant Chief Appraiser for the United States Department of Justice when Real Estate Valuation in Litigation was published in 1995.

The following table summarizes Mr. Durrance's findings:[8]

| | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Sale Date** | -- | 7/2/04[9] | 3/22/04 | 10/4/04 | 8/30/04 | 7/28/04 | 12/27/05 |
| **Sale Price** | -- | $8.25 mil | $2.7 mil | $5.402 mil | $28 mil | $5.9 mil | $9.11 mil |
| **Acreage** | 306.256 | 40 | 15.381 | 20.77 | 199.44 | 27.732 | 38.4 |
| **Price/Acre** | -- | $206,000 | $176,000 | $260,000 | $140,000 | $213,000 | $237,000 |
| **Sales Conditions** | -- | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| **Financing** | -- | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller | Cash to Seller |
| **Zoning/Future Land Use Entitlements[10]** | OUE-1/MDR | RE-1/MDR | RSF-4/MDR | RSF-4, RMF-2, PUD & MDR/MEDR | OUE-1/MDR | RMF-3/HDR | RSF-4/MEDR |
| **Utilities Available** | Water/Sewer | Water/Sewer | Water/Sewer | Water/Sewer | Water/Sewer | Water/Sewer | Water/Sewer |
| **Environmental Lands** | 20-30% | 25-30% | <5% | <5% | <10% | 20-25% | 20% |
| **Easements/Encumbrances** | Typical | Typical | Typical | Perpetual Mitigation Easement | South Creek/Transmission Power Lines | Typical | Typical |
| **Market Conditions** | Mid-2004 | Similar | Slightly Inferior | Slightly Inferior | Inferior | Similar | Superior |
| **Location** | Palmer Ranch | Similar | Inferior | Slightly Inferior | Similar | Inferior | Inferior |

[8] This chart reflects the data provided in the table in Mr. Durrance's appraisal report, PX 15 (BB-PLTF 04173-74).

[9] The contract for Contract 1 did not proceed to closing. Tr. 93.

[10] The Zoning/ Future Land Use Entitlement designations are:

OUE: Open Use Estate  RE: Residential Estate  RSF: Residential Single-Family
SFR: Single-Family Residential  RMF: Residential Multi-Family  PUD: Planned Unit Development
MDR: Moderate-Density Residential  MEDR: Medium-Density Residential  HDR: High-Density Residential
RMH: Residential Manufactured Home

| | Subject | Contract 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| **Acreage** | 306.256 | Slightly Superior | Slightly Superior | Slightly Superior | Similar | Slightly Superior | Slightly Superior |
| **Zoning/Future Land Use Entitlements** | OUE-1/MDR | Similar | Superior | Superior | Similar | Superior | Superior |
| **Utilities Available** | Water/ Sewer | Similar | Similar | Similar | Similar | Similar | Similar |
| **Environmental Lands** | 20-30% | Similar | Superior | Superior | Superior | Similar | Similar |
| **Easements/ Encumbrances** | Typical | Similar | Similar | Slightly Inferior | Inferior | Similar | Similar |
| **Comparability** | --- | Slightly Superior | Inferior | Superior | Inferior | Slightly Superior | Superior |

Using his six salient characteristics to compare each comparison property to McCann North, Mr. Durrance found that Contract 1 was very similar to McCann North in some respects -- it abutted the former railroad corridor, was located within the Palmer Ranch DRI, had a sales contract three months after the taking, required a rezoning, had 25-30% environmental lands (McCann had 20-30%), and no easements/encumbrances.  PX 15 (BB-PLTF 04173 to 04174).  However, he found Contract 1, a 40-acre lot priced at $206,000 per acre, to be slightly superior to McCann North because it was more than 250 acres smaller.  PX 15 (BB-PLTF 04174 to 04176).  Thus, Mr. Durrance deemed McCann North to be worth slightly less than Contract 1's $206,000 per acre sale price.  Tr. 93.

Mr. Durrance compared McCann North to Sale 2, a 15.381-acre property that sold for $176,000 per acre.  Mr. Durrance found that Sale 2 was inferior to McCann North with respect to location because Sale 2 was located off a road.  Tr. 97.  Mr. Durrance also noted that the contracts for the assemblage of lots that comprised Sale 2 had been signed in October 2002 and February 2003, over a year before April 2004, when the taking occurred.  PX 15 (BB-PLTF 04195).  Mr. Durrance determined that 2002 and 2003 were inferior years for sales as compared to 2004, because properties were selling more quickly and at higher unit values in 2004.  PX 15 (BB-PLTF 04175-76).  Accordingly, Mr. Durrance rated Sale 2 slightly inferior for market conditions.  Because McCann North was superior to Sale 2 with respect to two of the six characteristics -- zoning and environmental lands -- and relatively the same for the remaining factors, Mr. Durrance concluded that McCann North should be valued at more than $176,000 per acre -- the price at which Sale 2 sold.  PX 15 (BB-PLTF 04187).

Mr. Durrance rated Sale 3, a 20.77-acre property that sold for $260,000 per acre, as superior for zoning and environmental lands, slightly superior for size, similar for utilities available, and slightly inferior for market conditions, location, and easements.  PX 15 (BB-PLTF 04173 to 04174).  Mr. Durrance noted that Sale 3 was encumbered with a 2.3-acre mitigation easement that prohibited development.  PX 15 (BB-PLTF 04174).  During the sale process, the contract holder had the property rezoned from open use estate-1 to residential single-family-4 and residential multifamily-2, which allowed two more homes per acre.  See PX 15 (BB-PLTF 04197).  The contract holder then assigned the contract to a developer with a $1,891,500

assignment fee, and Mr. Durrance considered the assignment fee as part of the total sale price -- $5.402 million.  PX 15 (BB-PLTF 04174).  Mr. Durrance rated Sale 3 as superior to McCann North primarily because of this allowance for higher density.  Tr. 99.

Mr. Durrance rated Sale 4, a 199.44-acre property that sold for $140,000 per acre, as superior for environmental lands, inferior for market conditions and easements/encumbrances, and similar for every other factor.  Mr. Durrance characterized Sale 4 as an inferior property because it was encumbered with an overhead power line, which the developer buffered, and was divided by a creek, which required the construction of two bridges.  Tr. 102.  Further, Sale 4 could not be developed as a gated community because of local road access requirements, and Mr. Durrance saw this lack of flexibility as a potential drawback.  Tr. 102-04.  Mr. Durrance also noted that the $140,000 per acre price was set on August 30, 2003, a year before the closing on August 30, 2004, whereas McCann North's date of value was on April 2, 2004, the date of the taking, making McCann North a better property.  Tr. 101.

Mr. Durrance found that Sale 5, a 27.732-acre property that sold for $213,000 per acre, had an advantage over McCann North because Sale 5 was zoned for multi-family, high-density residential development, but that Sale 5 had environmental lands, which occupied 20 to 25% of the property.  PX 15 (BB-PLTF 04173).[11]  Mr. Durrance determined that Sale 5 had a less desirable location because it was adjacent to interstate I-75.  Tr. 105; PX 15 (BB-PLTF 04175).  Mr. Durrance concluded that while some of Sale 5's characteristics were better, and some were worse, all in all, it was slightly superior to McCann North, as reflected in its price of $213,000 per acre.  Tr. 105.

Finally, Mr. Durrance analyzed Sale 6, a 38.4-acre property, which sold for $237,000 per acre on December 27, 2005.  Sale 6 sold more than a year after the taking when demand was higher, at a better time than the valuation date for McCann North.  Tr. 106.  Mr. Durrance rated Sale 6 superior for zoning because the property sold with entitlements in place for a 211-unit residential development, a density of 5.5 units per acre, a higher density than permitted on McCann North.  PX 15 (BB-PLTF 0417, 04175).  Mr. Durrance concluded that Sale 6 was a superior property because it sold under better market conditions and was zoned for denser development.  PX 15 (BB-PLTF 04173 to 04175).

Mr. Durrance then ranked the properties based on superiority, as shown in the following table:[12]

| Sale | Ranking | Price/Acre (Rounded) |
|:---:|:---:|:---:|
| 3 | Superior | $260,000 |
| 6 | Superior | $237,000 |
| 5 | Slightly Superior | $213,000 |

[11]  Sale 5 was zoned to allow 13 dwelling units per acre, but it was developed at 5.77 dwelling units per acre.  DX 1 (US Ex. 000001-035).

[12]  This table is reproduced from Mr. Durrance's appraisal report.  PX 15 (BB-PLTF 04177).

| Sale | Ranking | Price/Acre (Rounded) |
|---|---|---|
| 1 | Slightly Superior | $206,000 |
| Subject | -- | $200,000 |
| 2 | Inferior | $176,000 |
| 4 | Inferior | $140,000 |

Based on the analysis of these six comparable sales, Mr. Durrance appraised McCann North at $200,000 per acre.  Tr. 108.

### Defendant's Expert's Valuation

Defendant's expert, John Underwood, Jr., appraised McCann North using a comparable sales analysis of five sales of vacant lots within Sarasota County.  Tr. 477.[13]  Mr. Underwood's analysis included three properties that Plaintiff's expert used -- properties located on Cattleman Road (Sale 5 in Mr. Durrance's study, A-1 in Mr. Underwood's), on the east side of Honore Avenue north of McCann North (Sale 4 in Mr. Durrance's study, A-2 in Mr. Underwood's), and on Honore Avenue south of Clark Road (Sale 3 in Mr. Durrance's study, A-3 in Mr. Underwood's).  Tr. 480; PX 15 (BB-PLTF 04175); DX 1 (US Ex. 000001-035).

Mr. Underwood utilized an approach known as a quantitative comparable sales analysis and appraised McCann North at $145,000 per acre.  According to the Uniform Standards of Federal Land Acquisition, published by the Federal Government, also known as "The Yellow Book," the quantitative approach is the preferred method when data is available.  Tr. 26, 484.[14]  In a quantitative analysis, the appraiser quantifies component parts or characteristics that impact a property's value.  Tr. 484.  For example, if the appraiser determines that a comparison property has a better location than the subject property, he may decrease the per acre sales price of the comparison property by 10% to make it more closely resemble the location of the subject property.  The appraiser then uses the adjusted prices of the comparison properties to determine

---

[13] The Court admitted Mr. Underwood as an expert in real estate appraisal.  Tr. 464.  Mr. Underwood is a real estate appraiser and consultant and president of Appraisal & Acquisition Consultants, Inc.  Tr. 457; DX 2.  He is a state-certified General Appraiser in Florida, where he is also a registered real estate broker and a member of the Jupiter-Tequesta-Hobe Sound Board of Realtors.  DX 2.  Mr. Underwood holds "Member Appraisal" and "Senior Residential Appraiser" designations from the Appraisal Institute.  DX 2.  He has been on the national faculty of the Appraisal Institute since 1984, and has taught all of the required courses.  Tr. 459.  Mr. Underwood has been qualified as an expert witness in federal court approximately 50 times, including district and bankruptcy courts in Florida.  Tr. 462; DX 2.

[14] The Uniform Standards for Federal Land Acquisition is produced by the federal government and is intended to provide "general principles applicable to the appraisal of property for federal land acquisitions by both voluntary means and condemnation."  Uniform Standards for Federal Land Acquisition 1 (The Appraisal Institute, 5th ed. 2000), DX 3.  The other treatises the parties submitted do not express a preference for either the qualitative or quantitative approach.

the value of the subject property.

Mr. Underwood explained how he determined the appropriate numerical adjustment for a given characteristic, testifying:

> What appraisers attempt to do by making quantitative adjustments is looking at the component parts and attempting to abstract what was done in the market, even though a buyer may not say I'm going to be five percent, you can look at the component and say here's a difference and it appears to be in the 75 percent.

> So we looked at these comparable sales, looked at them in reference to their date of sale in relationship to the date of value, looked at them in the major property characteristics, locations, size, land use regulations, and came to an indicated value on each one of the comparable sales.

Tr. 481.

The first step in Mr. Underwood's analysis was adjusting the comparable properties' sales prices for the time of sale. If the comparison property sold after the date of the taking, it sold under superior market conditions. To reflect this advantage, Mr. Underwood adjusted the prices of comparison sales that occurred more than six months after April 2004 downward by 1.5% per month so that the sale price better reflected the market conditions in April 2004. Mr. Underwood decreased a property's per acre price when he deemed it better than McCann North because that meant that McCann North would sell for less. Similarly, Mr. Underwood adjusted the prices of comparable sales that occurred before April 2004 upward by 1.5% per month to reflect the fact that real estate prices were increasing in 2004. Tr. 481-83. Mr. Underwood also made adjustments for size, location, and applicable land use regulations. Tr. 486-88.

Mr. Underwood determined that large lots sold for less per acre than small lots and applied a 35% large-lot discount to McCann North, explaining:

> I went through an analysis where I utilized large sales that were not appropriate for direct adjustment, but you can abstract adjustments out of those sales and make comparisons, and came to a conclusion that for every 100 acre difference in size, there should be a 20 percent adjustment, up to 200 acres. I got to 250, I got to 300, I wasn't finding an additional adjustment was required. So the way this 35 percent was calculated, you take the difference in size, and these are all 25, 20, 27 [acres]. I didn't try to get so specific and make a 33 percent or a 32. The market is not that perfect, but if you look at that, these 20-acre segments, 25 acres represent one-quarter of a hundred acre segment. So I've got a whole hundred acre segment between 100 and 200, and that's a 20 percent adjustment. I've got another segment from 25 to a hundred that's not accounted for, that's 75 percent of the 20, and that's where the 35 comes from. Seventy-five percent of 20 is 15 percent, so I add the 20 and 15 together to get the 35 percent adjustment.

Tr. 486-87. Mr. Underwood attributed the difference in per acre costs to the fact that larger lots impose greater carrying costs on developers. Tr. 486-87, 517-18. Additionally, Mr. Underwood

adjusted the sale price of Sale A-3 to reflect the fact that the sale had been recorded via two separate deeds for a total purchase price of $3,510,500, and the buyer paid an additional $1,891,500 to the original contract holder because the property was rezoned to a higher density, for a total price of $5,402,000.  DX 1 (US Ex. 000001-035).

The following table summarizes the adjustments that Mr. Underwood made:[15]

| | Subject | A-1 | A-2 | A-3 | A-4 | A-13 |
|---|---|---|---|---|---|---|
| Location | S end of Honore Ave. | W side of Cattleman Rd. | E side of Honore Ave., S of Central Sarasota Pkwy. | E side of Honore Ave, S of Clark Rd. | NW Corner of Cattleman Rd. & Colonial Oaks Blvd. | S side of SR 681, E of US 41 |
| Sale Price | --- | $5.9 mil | $28 mil | $5.402 mil | $5.3 mil | $19,959,100 |
| Sale Date | | Jul-04 | Aug-04 | Oct-04 | Nov-04 | Aug-05 |
| Cond of Sale | | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| Property Interest | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Zoning/Land Use | OUE-1/MDR | RMF-3/HDR | OUE-1/MDR | OUE-1/MDR | OUE-2 & RSF-3/MDR & OFFMF | RMH/MDR |
| Acreage | 300,000 | 27.732 | 199.44 | 20.8 | 25.746 | 221.77 |
| Price/Acre | | $212,751 | $140,393 | $259,712 | $205,857 | $90,000 |
| Adjustments | | | | | | |
| Financing | | 0% | 0% | 0% | 0% | 0% |
| Time | | 0% | 0% | -9% | -11% | -15% |
| Time-Adjusted Sales Price | | $212,751 | $140,393 | $236,338 | $183,213 | $76,500 |
| Location | | 10% | 0% | 0% | 10% | 20% |
| Property Size | | -35% | 0% | -35% | -35% | 0% |
| Land Use Regulation | | -5% | 0% | -5% | 0% | -10% |
| Total Adjustment | | -30% | 0% | -40% | -25% | 10% |
| Adjusted Price/Acre | | $148,926 | $140,393 | $141,803 | $137,410 | $84,150 |

---

[15] This chart reflects the data provided in the table in DX 1 (US Ex. 000001-037).

Before the adjustments, the sale prices of the five comparable properties ranged from $90,000 to $259,712 per acre. Mr. Underwood then examined each property, compared it to McCann North, and adjusted the price per acre of each comparison property depending on four salient characteristics -- time, location, property size, and land use regulation. By adjusting the comparison property's price, Mr. Underwood was attempting to make the comparison property's price reflect the price of McCann North.

For three properties -- Sales A-3, A-4, and A-13 -- Mr. Underwood adjusted the sale price based on the time of sale before adjusting for any other characteristics. Tr. 486; see also DX 1 (US Ex. 000001-035 to 036). He adjusted the prices of these properties downward because the properties sold more than six months after the April 2004 taking, and prices were increasing in that time period. Tr. 482-83. Specifically, Mr. Underwood adjusted the price of Sale A-3 by negative nine percent because the sale occurred in October 2004, six months after the date of valuation. Similarly, Mr. Underwood adjusted the price of Sale A-4 by -11% because the sale closed in November 2004. Lastly, he applied a -15% adjustment to Sale A-13 because the sale was contracted on March 10, 2005, and closed on August 25, 2005. See DX 1 (US Ex. 000001-037, 079).

Mr. Underwood did not make any adjustments to the price of Sale A-2 because he determined that it was the property most similar to McCann North. Tr. 488-89.[16] Like McCann North, Sale A-2's highest and best use was residential development. DX 1 (US Ex. 000001-035). Furthermore, it had a similar size and was located within the Palmer Ranch DRI. Id. While Sale A-2 was bordered by an interstate, Mr. Underwood concluded that its location did not affect the desirability of the property because environmentally sensitive lands buffered the interstate from the property. Id. However, Mr. Underwood did not specify how wide the buffer was, and the record does not indicate this. See DX 1 (US Ex. 000001-064 to 065), DX 13.[17]

Mr. Underwood found Sale A-1 to be very similar to McCann North. Tr. 489-90 ("I would put the greatest influence after [Sale A-2] on sales A-1 and A-3.").[18] Mr. Underwood adjusted the price of Sale A-1 downward by five percent to reflect the fact that it was zoned at 13 dwelling units per acre -- a higher allowable density than the one to five dwelling units per acre permitted on McCann North. Tr. 491; DX 1 (US Ex. 000001-035). Mr. Underwood decreased the price by an additional 35% because of the large-lot discount. DX 1 (US Ex. 000001-037). He also increased the price of Sale A-1 by 10% because of A-1's inferior location -- farther north, near an interstate, next to rental apartments, and near older homes. Tr. 489-90. In sum,

---

[16] In contrast, Mr. Durrance found Sale A-2 (Sale 4 in his analysis) inferior to McCann North.

[17] There is an aerial photo of Sale A-2 in the appendix to Mr. Underwood's report but details are not discernible. DX 1 (US Ex. 000001-064). The interstate is not labeled and the dimensions of the buffer are not provided.

[18] In contrast, Mr. Durrance found Contract 1 most similar to McCann North, a property Mr. Underwood did not use.

16

Mr. Underwood's adjustments for Sale A-1 resulted in a total downward adjustment of 30%, for a final price of $148,926 per acre.  DX 1 (US Ex. 000001-037).

Mr. Underwood found Sale A-3 to be highly similar to McCann North.  Tr. 490.  He first applied a negative nine percent adjustment for time because the contract for Sale A-3 closed in October 2004, and prices had increased since April.  DX 1 (US Ex. 000001-037).  As with Sale A-1, Mr. Underwood applied a negative five percent adjustment to Sale A-3 because it allowed for denser development -- seven dwelling units per acre.  Tr. 491.  He also applied the 35% large-lot discount because Sale A-3 was 20.8 acres, resulting in a total adjusted price of $141,803 per acre.  DX 1 (US Ex. 000001-37).

Mr. Underwood adjusted the price of Sale A-4 by -11% because the contract for Sale A-4 closed in November 2004, and prices had increased between April and November.  Mr. Underwood then adjusted Sale A-4 upward by 10% because of its inferior location and downward by 35% for the large-lot discount.  DX 1 (US Ex. 000001-036 to 037).  Mr. Underwood testified that Sale A-4 was farther north than McCann North and was not within the Palmer Ranch DRI, resulting in an upward 10% location-based adjustment.  Tr. 489-90.  Mr. Underwood concluded that the price of Sale A-4 should be adjusted downward by 25%, for a final adjusted price per acre of $137,410.  DX 1 (US Ex. 000001-037).

Finally, Mr. Underwood rated Sale A-13 as the property least comparable to McCann North.  Tr. 491.  He included Sale A-13 in his analysis because of its large size -- 221.77 acres.  Id.  Mr. Underwood first adjusted the price of Sale A-13 downward by 15% for time of sale to reflect the fact that it sold in better market conditions.  DX 1 (US Ex. 000001-037).  He applied a positive 20% adjustment for location because Sale A-13 was adjacent to a mobile home development, and the only access point was next to the mobile home development.  Id.  However, that increase was partially offset by a -10% adjustment because the property was zoned for higher density -- 8.4 dwelling units per acre.  DX 1 (US Ex. 000001-036).  The final adjusted price of A-13 was $84,150 per acre.  DX 1 (US Ex. 000001-036 to 037).

After the adjustments, the prices per acre of the comparison properties ranged from $84,150 to $148,926.  DX 1 (US Ex. 000001-037).  Based on his comparable sales analysis, Mr. Underwood put the greatest weight on Sale A-2, which had an adjusted sales price of $140,393 per acre, because he found it to be most similar to McCann North, followed by Sales A-1 and A-3, which sold for $148,926 and $141,803 per acre, respectively.  Tr. 489-90; DX 1 (US Ex. 000001-037).  As such, Mr. Underwood concluded that the before value of McCann North was $145,000 per acre.  Tr. 488.

## Just Compensation for the Decrease in Value of McCann North Due to the Encumbrance of the Trail

The Court finds Mr. Durrance's appraisal more persuasive for several reasons.  As a threshold matter, the Court found Mr. Durrance's overall methodology for analyzing properties' fair market values to be more compelling than Mr. Underwood's.  Mr. Durrance's approach was more comprehensive in that he addressed the presence of environmental lands and easements/encumbrances that affected potential development, while Mr. Underwood did not discuss these factors.  See MicroStrategy Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1355 (Fed. Cir. 2005) ("While an expert need not consider every possible factor to render a 'reliable'

opinion, the expert still must consider <u>enough</u> factors to make his or her opinion sufficiently reliable in the eyes of the court.") (emphasis in original) (citing <u>United States v. Barnette</u>, 211 F.3d 803, 815 (4th Cir. 2000)).  For example, on Sale 3/A-3 Mr. Underwood did not account for the fact that development was prohibited on 10% of the property, while Mr. Durrance deemed Sale 3/A-3 slightly inferior because of this prohibition.  Similarly, Mr. Durrance rated Sale 4/A-2 inferior with respect to easements/encumbrances because of a utility easement and a creek that imposed development costs, but Mr. Underwood did not take these factors into account.  Mr. Durrance's separate evaluation of the comparison properties' environmental lands, zoning/future land use entitlements, and easements/encumbrances resulted in a more persuasive and comprehensive analysis.  Mr. Underwood did not discuss the presence of environmental lands, and his analysis subsumed all land-related restrictions into one category -- land use regulation.

In assessing the experts' methodologies, the Court recognizes that Mr. Underwood used a quantitative analysis and that some commentators prefer quantitative adjustments.  The "Yellow Book" provides:

> The preferred method of adjusting comparable sales is through the use of quantitative adjustments whenever adequate market data exists to support them: "[q]uantitative adjustments are developed as either dollar or percentage amounts. Factors that cannot be quantified are dealt with in qualitative analysis." Only when adequate market data does not exist with which to support quantitative adjustments should the appraiser resort to qualitative adjustments (i.e., inferior, superior).

<u>Uniform Standards for Federal Land Acquisition</u> § A-17.  Similarly, the author of <u>The Appraisal of Real Estate</u> states: "[w]hen sufficient market data to support a quantitative adjustment is not available, appraisers investigate qualitative relationships, also using mathematical applications. Only when the market data is insufficient to apply mathematical applications should the appraiser resort to direct or relative comparisons." <u>The Appraisal of Real Estate</u> 307.  This Court is not persuaded that Mr. Underwood's numbers were derived from sufficient market data. While Defendant's expert applied various percentage-based adjustments, it is not clear what market data supported a particular adjustment or why a given numerical adjustment was chosen. For example, with respect to location, Mr. Underwood applied a 10% adjustment to Sales A-1 and A-4 and a 20% adjustment to Sale A-13, but did not explain why the locations of Sales A-1 and A-4 deserved a 10% adjustment -- as opposed to 5 or 15% -- or why Sale A-13 required twice the adjustment.  DX 1 (US Ex. 000001-037).  Similarly, for land use regulation, Mr. Underwood adjusted Sales A-1 and A-3 by -5% and Sale A-13 by -10%, but he did not explain how he derived these numbers.  <u>Id.</u>  Thus, although Mr. Underwood used a quantitative approach, the record does not support the particular quantifications he selected.  As such, Defendant's quantitative approach in this case was not persuasive.

As the author of <u>The Appraisal of Real Estate</u> explains, a qualitative assessment may be a superior methodology: "[q]ualitative analysis recognizes the inefficiencies of real estate markets and the difficulty in expressing adjustments with mathematical precision." <u>The Appraisal of Real Estate</u> 320.  Mr. Eaton continues: "[r]eliable results can usually be obtained by bracketing the subject between comparable properties that are superior and inferior to it." <u>Id.</u> at 321. Following this qualitative approach, Mr. Durrance bracketed McCann North between

comparable properties that were superior and inferior to it with respect to six factors.   Mr. Durrance explained his rationale for not using quantitative adjustments:

> And what the market does is that they take any given property, and they look at all these properties that are available, and what people have paid, and they say for the property that they are interested in, is this property better, or is it worse, and why, and for what characteristics, and what is the value of it.   And that's how they arrive at it, and so that is what I have tried, to the extent possible, to emulate here. . . . Everybody thinks that with an appraisal that you should have a chart, with a nice bow tied around it, and with specific adjustments.   That is not the way that the market works.   You don't see developers and people in the market going out there and saying, okay, for location, I am going to deduct seven percent from this comparable sale, and comparing it to the subject.   It doesn't work that way in the market.   They look at it and say what do I have here, and what can I do with it, and what are folks paying for similar type properties, and that's the way that it works.   So, this is what I have tried to do to the extent possible.

Tr. 191-92.

Using a qualitative assessment, Mr. Durrance better captured features of a property a knowledgeable buyer would consider, such as allowable density, the presence of environmental lands, and the impact of any easements or encumbrances, and analyzed how the pertinent features would affect the price a buyer was willing to pay.   He also better accounted for market conditions by using the contract date in his analysis.   In contrast, Mr. Underwood's quantitative approach did not address important considerations -- such as development restrictions, particular land use restrictions, and features that impose additional costs, and he used only the sale date for most sales.

Second, turning to the specifics of the appraisals, in examining the property each appraiser found most similar to McCann North, this Court finds Mr. Durrance's designated property far more similar to McCann North than Mr. Underwood's.   Mr. Durrance found Contract 1, a 40-acre property that was contracted to sell for $206,000 per acre in July 2004, most similar to McCann North.   Contract 1 was located within the Palmer Ranch DRI, was zoned similarly to McCann North, and had a similar amount of environmental lands.   PX 15 (BB-PLTF 04173 to 04174).   Mr. Underwood found Sale A-2 to be most similar to McCann North.   Sale A-2 was a 199.4-acre property that sold for $140,393 per acre in August 2004.   While Sale A-2 was also located within the Palmer Ranch DRI and was zoned to allow denser development than permitted on McCann North, this property had a creek running through it, which required the construction of two bridge crossings, as well as a utility easement.   DX 1 (US Ex. 000001-035).

The Court credits Mr. Durrance's testimony that Contract 1 is most similar to McCann North because the major difference between Contract 1 and McCann North -- size -- could be eliminated by selling McCann North as smaller parcels -- as Mr. Culverhouse testified he planned to do.   Tr. 449-50.   In addition, the existence of a creek on Mr. Underwood's most similar property, Sale A-2, significantly distinguishes Sale A-2 from McCann North.   The creek imposed additional development costs, affected how developments on the property could be situated, and was a feature of the property impossible to alter.   As Mr. Underwood acknowledged

in his report, the buyer of Sale A-2 had to pay for bridge crossings over the creek.  Nor is the Court persuaded that Mr. Underwood's Sales A-1 and A-3 were highly similar to McCann North. Sale A-1 was located in an inferior location next to an interstate.  Sale A-3 had a 2.3-acre mitigation easement.

Third, the Court does not find Mr. Underwood's application of a 35% large-lot discount to McCann North to be warranted.  In Mr. Underwood's view, size was a "major determination," because "very small parcels are selling at much higher prices per acre than the large parcel."  Tr. 486.  Mr. Underwood reasoned that large lots sell at lower prices per acre because developers of large lots incur higher carrying costs than developers of small lots.  Tr. 518-19.  Mr. Underwood applied an adjustment of 20% per 100 acres, but found that no further adjustment was warranted after reaching a certain point.  He used 200 acres as the break point and made no adjustment above this size.  See DX 1 (US Ex. 000001-039 to 040).

Mr. Underwood's analysis does not take into account the factual circumstances under which McCann North likely would have been sold.  See e.g., N. Paiute Nation, 183 Ct. Cl. at 346 (recognizing that the trial court is charged with assessing and determining a valuation amount "supported by all the evidence.").  Here, there is no evidence that Plaintiff would have been restricted to selling McCann North in one transaction or as one parcel.  Indeed, Mr. Underwood conceded that nothing required McCann North to be sold as a single 306-acre-property.  Tr. 543. Mr. Culverhouse credibly testified that he could not conceive of selling the property as one parcel, and that McCann Holdings had sold similar adjoining land in a series of smaller sales. Tr. 408-09, 449-50.

Moreover, while Mr. Durrance agreed that size was a factor to consider when appraising property, he rejected applying a large-lot discount here, testifying:

Q.    Why, what effect does that -- I mean, the fact that we have the McCann North property is almost 300 acres.  And these that you've selected as comparables, some of them are 15 or 20 acres. Did you adjust for the size difference between the properties?

A.    When you say "adjust," I look at it the way the market looks at it. When you're in this area, you don't have any other properties that are available that are that size.

So it's kind of like the old the proof is in the pudding.  You use what you have.  And in this area, you have little, small in-fill parcels that are left over for whatever reason, and then you have McCann North. So from a size perspective, I don't see anything that says the property should be penalized because it's 300 acres in size.  Or, let me back up, because the appraisers have chosen to make it 300 acres in size.

And in fact, I think that it's a positive, because you have the flexibility to either develop it as a whole, which is not out of character with other developments in Palmer Ranch that are 300 acres.  Turtle Rock, there are various communities in there that are hundreds of acres.

Tr. 108-09.  Mr. Durrance did take size into account, rating all properties ranging from 15.3 acres to 40 acres slightly superior to McCann North for size and the largest property, Sale 4 at 199.4 acres, similar to McCann North for size.  Mr. Durrance noted that there were no other properties available that were the size of McCann North, making its size an asset for developers.  Tr. 108-09.

The author of Real Estate Valuation in Litigation acknowledged that appraisers may make a price adjustment based on size:

> *Size regression* is the basic economic principle that as the number of units of a commodity increases, the price per unit paid for the commodity decreases.  It is the concept of the bulk sales discount.  As applied to land, as the number of units (*e.g.*, acres, square feet) in a tract of land increases, the price, or value, per unit tends to decrease.

Real Estate Valuation in Litigation 88.  However, the author of this treatise rejected the notion of universally imposing a "bulk sales discount":

> The fact that the government is condemning the entire ownership should not preclude the property owner from receiving compensation equal to the market value of the property as if voluntarily marketed in the most advantageous way.  The owner should not be forced to take a bulk sales discount when a bulk sale of the property does not produce its highest value, and is therefore not the highest and best use of the property.

Real Estate Valuation in Litigation 93.

It is settled law that land should be appraised at its highest and best use.  Olson, 292 U.S. at 255 ("The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable.").  As the Court recognized in Snowbank Enterprises, Inc. v. United States, "[a]ny and all factors, which would cause a reasonable seller to ask a higher sale price for the property and which would induce a reasonable buyer to pay a higher sale price for the property, should be considered."  6 Cl. Ct. 476, 484 (1984).  Decreasing the valuation of McCann North by a significant amount -- 35% -- because of its large size ignores the fact that it could have been sold as smaller parcels.

Fourth, Mr. Durrance's consideration of pricing using both the contract date and the sales date better captures the market dynamics that existed on the dates that each property's sale price was established.  Mr. Underwood used only the closing date as the date from which to base any adjustments for all but one sale, while Mr. Durrance considered both the contract date and closing date.  Tr. 94, 528.  Specifically, Mr. Underwood used the contract date for only one property, A-13, when the sales contract was executed in March 2005, and closed some five months later.  DX 1 (US Ex. 000001-079).  Mr. Underwood did not offer a persuasive explanation as to why he chose the contract date only for this property:

Q.      Okay, now why didn't you use the closing date in the last sale?

A.      On that last sale, things were changing so much in '05, I went ahead and

did it from the contract date.  It was changing in '04 and '03 as well.  But that sale was near closing in August of '05.  So I went from the contract date.

Tr. 528.  In contrast, for Sale A-2, he used the closing date, August 2004, when the sales contract was entered in May 2003, some 15 months earlier.  See DX 1 (US Ex. 000001-037, US Ex. 000001-057); PX 15 (BB-PLTF 04200).  Mr. Underwood acknowledged that the contract for Sale A-2 was signed more than a year before the sale closed, but he did not make any adjustments to the price.  Tr. 532-33.

By considering both the contract date and the closing date, Mr. Durrance's approach comported with accepted appraisal practices.  As the author of Real Estate Valuation in Litigation explains:

> In analyzing comparable sales, it is important for the appraiser to determine the date when an agreement was reached between the buyer and the sellers.  Sales of this nature often do not close and become a matter of public record until months and even years, after the buyer and seller have agreed on the price and the other terms of the sale.  By the time it is recorded, the sale may actually be several months old and the appraiser must consider an adjustment for its date of sale.

Real Estate Valuation in Litigation 134; see also The Appraisal of Real Estate 333 ("An adjustment for changes in market conditions between the date the contract is signed and the effective date of value may be appropriate.").

Because the Court credits Mr. Durrance's testimony and adopts his valuation of McCann North at $200,000 per acre, and because the parties agree that the Government took 99% of the value of the land underlying the corridor, the Court awards $1,267,200 as just compensation for the 6.4 acres encumbered by the trail.  DX 1 (US Ex. 000001-047 to 049); see also Tr. 494-95; Pl.'s Post-Trial Reply Br. 9.[19]

## Just Compensation for the Diminution in Value of the Remainder: Severance Damages

In addition to damages for the part taken, Plaintiff seeks severance damages of $1,910,165 -- $1,155,000 due to lost access, and $755,165 due to the need to buffer the trail to mitigate noise, crime, trespass, and the loss of seclusion and security.[20]  When the Government

---

[19] Ninety-nine percent of $200,000 is $198,000, and $198,000 x 6.4 equals $1,267,200.

[20] Plaintiff's approach to severance damages evolved over the course of this case. Initially, Plaintiff claimed the imposition of the Legacy Trail resulted in an overall $10,000 decrease per acre in the value of McCann North.  PX 15 (BB-PLTF 04189).  Subsequently, Plaintiff changed its approach and claimed specific damages -- cost-to-cure damages of $794,600 for the cost of constructing a landscape buffer and $1,155,000 for extending Honore Avenue to compensate for lost access.  Pl.'s Post-Trial Br. 6.  In its post-trial reply brief, Plaintiff lowered its claimed cost to cure to $755,165 for buffering and claimed that the value of the McCann remainder was diminished by at least $770,000 because of the trail.  Pl.'s Post-Trial Reply Br. 23-24.  Plaintiff did not alter the amount it claimed for lost access.

takes a portion of a single tract, just compensation includes any decrease in the value of the remainder that occurs as the result of the taking, and such compensation is referred to as severance damages. United States v. Miller, 317 U.S. 369, 376 (1943). Plaintiff has the burden of proof, and it must offer evidence that the remainder lost market value. Miller v. United States, 223 Ct. Cl. 352, 383-84 (1980); accord United States v. Honolulu Plantation Co., 182 F.2d 172, 178-79 (9th Cir. 1950). A court can only award severance damages if there is some reliable proof that the taking has actually caused a loss in market value. Moore v. United States, 54 Fed. Cl. 747, 753-54 (2002).

The cost to cure provides an alternative way to measure severance damages. The Federal Circuit has held "that once a plaintiff has established that a taking occurred, it is entitled to compensation for its costs in preventing the damage caused by government actions." Vaizburd v. United States, 384 F.3d 1278, 1286 (Fed. Cir. 2004). Such damages, referred to as the "cost to cure," are compensable when they are reasonable. Id. The cost to cure cannot exceed the diminution of the remainder's fair market value. United States v. 2.33 Acres of Land, 704 F.2d 728, 730 (4th Cir. 1983); 4A Nichols on Eminent Domain § 14A.04[2].

## The Experts' Assessment of the Diminution in Value of the Remainder

In conducting their "after taking" valuation, both experts used paired sales analyses to value McCann North in light of the recreational right-of-way. Tr. 115, 499. This method requires the appraiser to identify salient characteristics of the property and then find other properties in the market that share those characteristics that were sold within a reasonable time frame. See Tr. 21, 476. A paired sales analysis differs from a comparable sales analysis because in a paired sales analysis, the appraiser identifies pairs of sales that are as similar as possible for all but one factor. When the sales are compared, the difference in price is best explained by that particular feature that distinguishes the properties. Tr. 21-22; PX 3.

## Plaintiff's Paired Sales Analysis

In his analysis, Mr. Durrance compared sales of properties on and off the railroad corridor that eventually became the Legacy Trail -- a sparsely used but operational railroad corridor in two residential developments. Tr. 116-17; PX 15 (BB-PLTF 04181). The subdivisions contained lots directly on the corridor, and Mr. Durrance studied these subdivisions "to measure the difference in value, if any, of lots directly on a corridor versus lots off the corridor." PX 15 (BB-PLTF 04181). Although the sales occurred in the 1990's, Mr. Durrance used these sales in his analysis because the developments were located nearby -- Mission Estates was two-and-a-half miles from McCann North and Bay Oaks was immediately to the west of McCann North, and both developments were adjacent to the corridor. Tr. 117, 120.

In the first paired sales analysis, Mr. Durrance used 15 sales of vacant lots within Mission Estates, a residential community two-and-a-half miles away from McCann North. PX 15 (BB-PLTF 04181, 04183); Tr. 117-18. The sales occurred in 1998 and 1999. PX 15 (BB-PLTF 04183). After comparing eight properties on the corridor with seven properties off the corridor, Mr. Durrance concluded that properties on the corridor sold on average for $13,626 -- or $170 per lineal foot less than properties off the corridor -- a difference of 28%. Id.; Tr. 119.

Mr. Durrance conducted a similar paired sales analysis of properties within Bay Oaks Estates, a residential community directly to the west of McCann North.  Tr. 120.  He analyzed 16 sales of vacant lots that occurred in 1994 and 1995.  Tr. 12; PX 15 (BB-PLTF 04182).  Nine of the properties were located on the corridor, and seven were off the corridor.  PX 15 (BB-PLTF 04182).  He found that lots on the corridor sold, on average, for $8,050 or $130 per lineal foot -- a difference of 16% -- less than properties off the corridor.  Id.

In both Mission Estates and Bay Oaks Estates between 1994 and 1999, the corridor was occupied by railroad tracks but was sparsely used by the railroad, and there was no buffering on the lots.  Tr. 122-23.  Mr. Durrance explained how his paired sales analysis of lots on and off a railroad corridor was applicable to lots on and off a recreational trail:

> Well, you use the best that you have.  Number one, it is the same exact corridor, even though today there is a new easement, and it [has] a different use today.  There is a trail and reactivation to rail.  Those are the two uses that were outlined.  At this point in time, it was infrequently used rail.  So the question is, well, how does this stack up to today what this corridor is, and what the rights are within [it] . . . So some people look at the trail, and say, hey that is better than a railroad, and other people say, gosh, I would rather have an infrequently used railroad. So I used what I felt was the best that I could find on the exact same corridor as we are dealing with today, although the rights and uses are different.

Tr. 123-24.  Based on his paired sales comparisons, Mr. Durrance determined that the railroad corridor had a negative effect on property values and concluded that properties on the corridor sold for 16 to 28% less than properties off the corridor.  PX 15 (BB-PLTF 04188).

## Plaintiff's Anecdotal Evidence

Plaintiff also offered lay opinion testimony from an area resident who is a plaintiff in Rogers v. United States, No. 07-273L, to support its position that the Legacy Trail had a negative effect on property values.  Tr. 336-38, 368.  Samuel Dunley, who lives along the Legacy Trail in Apple Estates, which is near Mission Estates, testified that the trail "destroyed the enjoyment" of his property because of noise, crime, trespass, and the loss of the feeling of "seclusion."  Tr. 348-55.  He said that residents call the Legacy Trail the "Crime Trail" because "people were coming in by car in there and stealing stuff from all the houses, breaking into houses."  Tr. 348.  Mr. Dunley credibly testified about how the trail affected him and his property, saying:

> I looked around my property and realized things were missing. And then in future, as time went on we would -- I would be back there doing whatever and notice things were missing and see.  I quit cutting the grass back there and we put up fence and started trying to make the access hard for people so they couldn't just walk right in on our property.  But I could see the path through the high grass where people had come in from off the trail.
> . . .
>
> And I used to have a couple hundred crab traps back on the back corner there because I had a crab license and did that at one time.  And they took quite a few of those.  Those are easily sold.  And we have a four-car garage on the other

corner of the property back along the trail.  And I noticed that people had been in there.  I used to not lock it.  Found out I had to start locking things, everything.  Put everything in and lock it up because it wasn't going to be there any more.
. . .

Now I hear noises and people talking and things going on, and I have to go back there and look.  And a lot of times I've realized, yes, they're actually on the trail where they belong. But you hear them up at the house just like you think they're in the backyard.  So I don't have my seclusion or the security that we once had . . . .

Tr. 350-52. Mr. Dunley further testified that the burden imposed earlier by the railroad easement had been far less significant than that imposed by the Legacy Trail because he had not seen a train use the tracks in years and did not expect any trains to return.  Tr. 340-41; see also Tr. 414 ("I said I hadn't seen a railcar going up and down that track for years.").

**Plaintiff's Evidence on Future Uses of the Legacy Trail**

Mr. Durrance also researched non-recreational potential future uses for the Legacy Trail. He cited publications issued by Sarasota County, Manatee County, Lee County, the Tampa Bay Area Regional Transportation Authority, and the Urban Land Institute between 1999 and 2009, that contemplated an assortment of potential uses.  In his appraisal report, Mr. Durrance listed the following contemplated future uses:

- "Extend The Legacy Trail north of Clark Road, with an equal emphasis on recreational trail and transit use"

- Referring to the extension of the Legacy Trail "A transportation and/or transit component may be included in this segment"

- Referring to the north/south Bus Rapid Transit (BRT) "remaining phases would extend BRT …along other corridors in Sarasota County"

   . . .

- "Bus, BRT, and Commuter Rail are considered to be feasible by 2030 for application along the [Seminole Gulf Railway Limited Partnership] corridor"

   . . .

- Referring to the CSX Rail Corridor "The Sarasota/Manatee MPO should leave open the possibility of using the existing rail tracks for some form of passenger rail transportation service in the future….It may be possible to develop joint use of the rail corridor for transit and bicycling, [thus] expanding intermodal access throughout the region"

- "It may be appropriate to introduce passenger rail service within existing CSX tracks linking Venice with Sarasota and Bradenton"

. . .

PX 15 (BB-PLTF 04179 to 04180) (internal citations omitted). Mr. Durrance opined that a reasonably knowledgeable buyer would take this publicly available information into account and "give consideration to the potential for uses more intense than what currently exists." PX 15 (BB-PLTF 04181).

**Defendant's Paired Sales Analysis**

Mr. Underwood conducted a paired analysis to refute Plaintiff's claim that the Legacy Trail negatively affected McCann North's property value. Mr. Underwood located trails throughout Florida and compared properties on a trail with nearby properties not on a trail. Tr. 496-505; see generally DX 4. Mr. Underwood considered 38 properties -- 21 that sold in 2002-2005 on or near the Pinellas Trail, which is located near St. Petersburg, Florida; 17 located near Orlando, Florida -- 11 on or near the Cady Way Trail that sold in 2007-2009; and 6 on or near the West Orange Trail that sold in 2006 and 2007. DX 4. For each pairing, Mr. Underwood identified a property sale on a trail and compared it with the sale of a similar property in the same neighborhood and within the same time frame but not on a trail. He concluded that "there was no empirical evidence one way or the other that the trail had a positive or a negative influence based on pure sales data." Tr. 505. Specifically, 9 pairings showed that properties off the trail were worth more, 14 pairings indicated that properties off the trail had a lower value, and 7 pairings had a price differential of less than 3%, which Mr. Underwood deemed statistically insignificant. Tr. 505-06. Thus, when Mr. Underwood applied his findings to McCann North, he concluded that there was "no negative impact on the adjacent residential land." Tr. 513.

**Defendant's Trail Impact Studies**

Mr. Underwood also reviewed trail impact studies -- a 2000 study of three trails in Nebraska, a 2006 presentation concerning trails located throughout the country, and a 2001 review of nine studies using trails from across the country. See generally DX 6, DX 7, and DX 8; Tr. 507-09. He found the documents on the website of the American Trail Conservancy -- an organization that advocates for trails. Tr. 573. The Nebraska study surveyed residents living within one block of a trail and found that almost two-thirds of the respondents thought the trail improved property values. DX 6. The 2006 presentation stated that several studies found that fears crime would go up and property values would go down were unfounded and reported that homes near a trail sold more quickly and closer to list price. DX 8. The 2001 review showed that while between 2 and 32% of residents near trails as well as realtors thought the trail negatively affected property values, the presence of a trail had a neutral impact on the saleability or value of property. DX 7 (US Ex. 000007-001, 000007-005 to 014).

**The Court's Assessment of the Experts' Opinions on Whether the Legacy Trail Negatively Impacted Property Values**

Plaintiff's evidence established that the Legacy Trail had a negative impact on the value of McCann North. Although Plaintiff's expert in his paired sales analysis used properties bordering on an existing railroad easement -- not a recreational trail -- these properties yielded the best data available in the subject locale. Mr. Durrance cannot be faulted for not using sales

on and off the Legacy Trail itself when sufficient data was apparently nonexistent at the time he performed his analysis. Defendant's expert similarly did not attempt to do a paired sales analysis of properties on and off the Legacy Trail itself, or suggest that data for such an analysis was available. Rather, Mr. Underwood resorted to paired sales analyses in areas farther away from the Legacy Trail -- St. Petersburg and Orlando -- and looked at studies published by an organization that advocates for trails that focused on select trails across the country. The Court does not deem Defendant's paired sales and broad based studies by an advocate for trails to be as pertinent and objective as paired sales on the corridor at issue. In any event, the record indicates that Mr. Durrance's paired sales analysis comparing sales on and off the defunct railroad corridor resulted in a lesser decrease in value than a comparison of properties on and off the Legacy Trail would have. Instead of an occasional train, owners of property adjacent to the Legacy Trail experienced far more burdensome intrusions -- such as noise, crime, trespass, and loss of seclusion -- which would have had a more detrimental effect on property value than the little used railroad corridor.

In addition, Mr. Durrance's paired sales analysis better accomplished the goal of a paired sales analysis -- isolating and quantifying the effect of a single variable -- than did Mr. Underwood's analysis. As Mr. Durrance testified, a paired sales analysis utilizes "apples-to-apples" comparisons. Tr. 117-18. "Paired data analysis is based on the premise that when two properties are equivalent in all respects but one, the value of the single difference can be measured to indicate the difference in price between the two properties." The Appraisal of Real Estate 316. Mr. Durrance used properties with little difference except for their locations on or off the corridor. Tr. 118, 121 ("So they are all about the same size, and the same width, the same date, the same community, and in many instances, on the same road . . . . [T]he only difference of note is the corridor.").[21]

In contrast, the properties Mr. Underwood compared were too dissimilar to provide a meaningful comparison. Beyond their location on a trail, the properties Mr. Underwood used differed in age, size, and number of rooms, making it difficult to isolate the effect of the trail. For example, Mr. Underwood compared a house built in 1964 with a house built in 1988 -- a 24-year difference. Tr. 557-58. Mr. Underwood argued that this was a fair comparison because "the older property looked like it had had some updating." Id. Similarly, Mr. Underwood compared a four-bedroom, three-bathroom house with a three-bedroom, two-bathroom house. Tr. 558-59. Mr. Underwood admitted that "the bath count does make a difference" but maintained that he did not expect the pairings to account for all possible differences between properties. Id. Furthermore, Mr. Underwood failed to account for the fact that some of the properties on the trail he used had buffering or were otherwise separated from the trail, which would mitigate the trail's effect on property values. Tr. 552-53, 561-63. This Court is persuaded

---

[21] Defendant's criticisms of Mr. Durrance's paired sales approach are unfounded. Defendant criticized Mr. Durrance's paired sales analysis because three of the properties in Mr. Durrance's Mission Estates analysis were adjacent to a retention pond, but Mr. Durrance took this retention pond into account, finding that the three lots next to the pond sold for approximately $1,000 more than a nearby lot not next to the pond. Tr. 118-19. Defendant also criticized Mr. Durrance for using properties that builders bought in bulk sales, but Mr. Durrance excluded bulk sales from his analysis. Tr. 278.

that Mr. Underwood's paired sales analysis underestimates the impact of the Legacy Trail on the value of the McCann North remainder.

In sum, the Court finds that the imposition of the Legacy Trail negatively affected the fair market value of McCann North. Before the taking, McCann North was adjacent to a rarely used rail corridor. After the taking, McCann North was encumbered with an oft-used recreational trail, which caused residents to experience noise, crime, trespass, and loss of both seclusion and security. While the experts presented conflicting analyses regarding the effect of recreational trails on property values in general, the evidence supports a finding that the Legacy Trail negatively impacted the value of the land abutting that trail in McCann North.

Mr. Durrance found that the McCann North remainder -- in particular, the land adjacent to the trail -- decreased in value between 16 and 28% due to the imposition of the trail. Although according to Plaintiff, this decrease in value equates to at least $770,000, Plaintiff does not seek this amount as just compensation for this impact of the taking. Rather, it seeks $755,165, the cost to cure the harm caused by the trail by using berming or buffering to mitigate the noise, intrusion, and potential for trespass and crimes in the adjacent land. Pl.'s Post-Trial Reply Br. 23-24.

In order to obtain cost-to-cure damages, Plaintiff must establish that the cost to cure does not exceed the diminution in fair market value of the remainder. 2.33 Acres of Land, 704 F.2d at 730; United States v. Dickinson, 152 F.2d 865, 870 (4th Cir. 1946), aff'd, 331 U.S. 745 (1947). As such, Plaintiff must establish what the diminution in value of the remainder was. Based on his paired sales analyses of properties in Bay Oaks and Mission Estates, Mr. Durrance found that properties adjacent to the trail were worth 16 to 28% less than properties off the corridor. PX 15 (BB-PLTF 04181 to 04183). Plaintiff used this 16 to 28% decrease to derive a decrease in value of $770,000, reasoning as follows:

> Durrance's paired-sales studies demonstrated that unbuffered residential lots adjoining this corridor were between 16-28% less valuable due to the presence of the public rail-trail corridor. As applied to the McCann property, this would mean that all of the residential lots along the more [than] one-mile long western boundary of the property would be diminished in value by 16-28%.

> The lots in Durrance's paired-sales study were 80-foot unimproved residential lots. Pls' Trial Ex. 5, pp. 24-25. A total of 70 such lots would border the 5,576 foot long rail-trail corridor along the McCann property (5,576 divided by 80 equals 70). The undeveloped residential lots in Durrance's paired-sales study sold for between $48,914 (Mission Estates) and $50,143 (Bay Oaks) per lot on average if they were not located on the rail-trail corridor, and those lots located along the rail-trail corridor sold for an average of $35,288 (Mission Estates) to $42,100 (Bay Oaks) per lot. Id. Thus, in the late nineties, the diminution in value per residential lot was between $8,043 (Bay Oaks) and $13,626 (Mission Estates) per lot, or an average of almost $11,000 per lot ($8.043 + 13,626 =$10,835).

. . .

A total of 70, 80-foot lots could be located along the 5,576 foot long western boundary of the McCann land next to the rail-trail corridor. Left unbuffered, these lots would be diminished in value by at least $770,000 (70 lots times $11,000). And, this diminution in value is calculated using the 1990s land values. If adjusted to 2004, the land values greatly exceed the cost of mitigating this diminution in value by constructing a buffer.

Pl.'s Post-Trial Reply Br. 22-23 (footnote omitted).

The Court is persuaded that Plaintiff's claimed decrease in the fair market value of the McCann North remainder due to the adjacency of the Legacy Trail is reasonable. The highest and best use of McCann North is residential development, and it is clear there is diminution in the fair market value of the land adjacent to the 5,576 lineal foot corridor. Rail service on the rail line had ceased before the taking, and the rail corridor had been unobtrusive. Rogers v. United States, 90 Fed. Cl. 418, 421 (2009). Mr. Dunley testified that he has experienced increased noise, trespass, crime, and loss of seclusion and security due to increased traffic on the trail. Tr. 353-54.

The Court recognizes that Plaintiff's quantification of the diminution in value to the remainder at $770,000 assumes that McCann North would be developed along the corridor using 80-foot residential lots -- an assumption which may not occur. Nevertheless, the Court is persuaded that this quantification of the diminution in value of the remainder is reasonable and sufficient for comparison to Plaintiff's cost to cure. First, it is clear that McCann North will be developed in residential lots, even if not in these precise dimensions. Second, the evidence establishes that the harm to the adjacent landowners' property from the Legacy Trail is greater than the harm from the little used rail corridor in the paired sales analysis. Finally, real estate prices in the 1990's, the timeframe of Mr. Durrance's paired sales analysis, were lower than at the time of the taking in 2004.

**Buffering**

Plaintiff seeks $755,165 in damages to construct a landscape buffer to cure this negative impact caused by the adjacency to the trail. Pl.'s Post-Trial Reply Br. 24. Mr. Durrance concluded that buffering through landscaping and/or a berm is required when a property is adjacent to something unwanted -- a rail corridor, a recreational trail, power lines, etc. Tr. 124-27. Mr. Durrance's report states: "[m]arket reaction to corridor uses, such as the subject, is to provide increased buffers adjacent to the corridor to mitigate the negative aspects associated with these type corridors which include loss of privacy, trespassing, and increases in noise, traffic, litter and crime." PX 15 (BB-PLTF 04188).

Mr. Durrance determined that five percent of the McCann North land adjacent to the trail did not need to be bermed because it consisted of wetlands, which provide natural buffering. Tr. 129-30; PX 15 (BB-PLTF 04186) ("It is recognized that within the subject area there are environmentally sensitive lands which in some instance limit development immediately adjacent to the subject corridor. These environmental areas act as natural buffers and therefore limit any increased buffer costs or damages as a result of the new easement encumbrance."). Defendant's expert did not challenge Mr. Durrance's quantification of the wetlands. Buffering 95% of the property would result in a 5,297 lineal foot buffer.

After speaking with Don Neu and Jim Palman of WilsonMiller, Inc., a planning and engineering firm experienced in constructing buffers in Sarasota, Mr. Durrance determined that buffering the land adjacent to the corridor would cost approximately $150 per lineal foot. WilsonMiller estimated it would cost $200-250 per lineal foot to buffer McCann North with the trail in place.  If there were no trail, the buffering required adjacent to the railroad corridor would have been less extensive and would have cost $75 per lineal foot.  Mr. Durrance averaged the estimates to arrive at $225 per lineal foot.  He then reduced the cost by $75 per lineal foot -- the cost of the less extensive buffering that would have been required in the pre-taking condition, yielding $150 per lineal foot.  Tr. 127-28, 300; see also PX 15 (BB-PLTF 04186).  Mr. Durrance found that if 95% of the 5,576 lineal feet adjacent to the corridor -- or 5,297 lineal feet -- required buffering, it would cost $794,600, Tr. 130, but Plaintiff reduced its claimed cost to cure via buffering to $755,165 in its Post-Trial Reply Brief.  Pl.'s Post-Trial Reply Br. 24.

Defendant argues that Plaintiff should not be awarded any damages associated with buffering or berming and characterizes buffering costs as "consequential damages" Plaintiff would have incurred if the land were developed regardless of the existence of the trail. Defendant points to testimony from Mr. Underwood, who rejected including the cost of buffering because he assumed that there would be buffering with or without the trail.  Tr. 521-22. Defendant also cited testimony from Mr. Durrance, who testified that nearby developments, such as The Isles and Silver Oaks, had buffering, and he expected McCann North to be developed similarly.  Tr. 124-25.   Thus, Defendant argues that McCann North -- like other area developments -- would have been developed with berming regardless of the Legacy Trail.

Defendant's argument ignores the reality that the Legacy Trail imposes an intrusive burden on adjacent property owners.  Other area developments without the adjacency of the trail would not require the same level of remediation.   The evidence established that typically berming occurred in areas of residential developments that bordered public roads, power lines, and adjacent developments.  The fact that this type of berming was de rigueur does not mean that the same extent of berming would have been necessary on land abutting the trail.  In contrast, Mr. Durrance found that property adjacent to the trail required more extensive berming; he acknowledged that in the pre-taking condition a residential development would have required more modest buffering of land adjacent to the railroad corridor at a cost of $75 per lineal foot, which he deducted from the claimed cost of berming here.  Tr. 124-28.  As such, Mr. Durrance's cost for buffering took into account the fact that buffering would have been provided for adjacent developments and deducted an appropriate amount.

In this Court's view, the cost to cure the loss of seclusion, noise, and increase in incidents of trespass that occurred because of the imposition of the trail can constitute a proper measure of severance damages if buffering and/or berming mitigates these harms and the cost to cure is less than the diminution in value to the remainder.  Cf. Dickinson, 331 U.S. at 751 ("If the resulting erosion which, as a practical matter, constituted part of the taking was in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage, as the courts below held."); Hetland v. Capaldi, 240 A.2d 155, 158 (R.I. 1968) ("[W]here there has been a partial taking that results in a loss of seclusion with respect to the remaining land, such loss of seclusion is an element that may be considered in establishing the amount of damages to which the owner is entitled . . . .").

In order to recover its claimed cost to cure, Plaintiff must establish that the cost to cure does not exceed the diminution in value to the remainder. 2.33 Acres of Land, 704 F.2d at 730; Dickinson, 152 F.2d at 870; 4A Nichols on Eminent Domain § 14A.04[2]. In assessing the damage to the remainder, the Court may look to the entirety of the property, if appropriate, or the segments of the remainder directly impacted by the taking. See Georgia-Pacific Corp. v. United States, 226 Ct. Cl. 95, 112 (1980) (determining severance damages for one property by analyzing the property as five areas that were impacted by the taking differently); Sys. Components Corp. v. Fla. Dep't of Transp., 14 So. 3d 967, 978 (Fla. 2009) ("Severance damages are part of the constitutional guarantee of 'full compensation' and reimburse the owner for the reduction in value the taking causes to any remaining land . . . ."). "The cost to cure is a flexible tool. It can be used alone or in conjunction with the payment of just compensation for any uncured severance damages." 4A Nichols on Eminent Domain § 14.02.

As explained above, the Court finds Plaintiff's quantification of the diminution in value of the remainder as $770,000 due to the adjacency of the trail to be reasonable. The evidence established that the Legacy Trail negatively impacted McCann North due to increased noise, crime, trespass, and the loss of the feeling of seclusion. Tr. 348-55. These negative effects of the trail would have adversely affected the price a buyer was willing to pay for the remainder. Tr. 168-69; see Georgia-Pacific Corp., 226 Ct. Cl. at 107 ("[W]hether or not remainder property in a partial taking situation suffers resulting depreciation is a question of fact. Such a determination embraces all the facts and circumstances a reasonable, fully-informed and knowledgeable willing seller and willing buyer would consider at the time of a hypothetical transaction on the date of taking."); L.A. Cnty. Metro. Transp. Auth. v. Cont'l Dev. Corp., 941 P.2d 809, 820 (Cal. 1997) ("Items such as view, access to beach property, freedom from noise, etc. are unquestionably matters which a willing buyer in the open market would consider in determining the price he would pay for any given piece of real property.") (quoting Pierpont Inn, Inc. v. State, 449 P.2d 737, 746 (Cal. 1969)); Dennison v. State, 239 N.E.2d 708, 711 (N.Y. 1968) ("[Q]uietude, the tranquility and the privacy of the property, qualities which the claimant prized and desired and which undoubtedly are items that would be taken into account by an owner and a prospective purchaser in fixing the property's market value.") (Fuld, C.J., concurring).

Plaintiff initially sought $794,600 in buffering costs, more than the claimed diminution in value to the McCann North remainder, $770,000, but in its Post-Trial Brief reduced its claimed buffering costs to $755,165.[22] The law is clear that cost-to-cure severance damages cannot exceed the diminution of the remainder's fair market value. 2.33 Acres of Land, 704 F.2d at 730; Dickinson, 152 F.2d at 870; 4A Nichols on Eminent Domain § 14A.04[2]. Because Plaintiff's claimed buffering costs of $755,165 are less than the diminution in value to the remainder and are supported by the record, an award of $755,165 as cost-to-cure severance damages is appropriate.

---

[22] Although Plaintiff did not articulate how it arrived at $755,165, there is a sufficient factual predicate in the record to support at least $755,165 as the cost of berming or buffering the land adjacent to the corridor. Tr. 128-31, 175.

### Loss of Access

Plaintiff seeks another component of severance damages due to a different impact of the trail -- the inability to access McCann North via Preymore or Bay Streets because the Legacy Trail precluded extending these streets to the property. Tr. 142-45. Specifically, Plaintiff seeks $1,155,000, the cost of extending Honore Avenue to obtain an additional access point. Prior to the imposition of the trail, Mr. Culverhouse had an opportunity to have the county extend Bay and Preymore Streets to McCann North. The extension of these streets would have given McCann North two additional access points in close proximity to a nationally recognized school, beaches, and Route US 41. The imposition of the Legacy Trail foreclosed the opportunity for extending those streets because the potential reactivation of rail service made it impossible to extend the streets across the trail easement.

As Mr. Culverhouse credibly testified and the plats indicate, Sarasota County had obtained dedicated right-of-ways permitting the extension of Preymore and Bay Streets which would provide access to McCann North. Tr. 442-44 (discussing PX 18 and PX 19). However, due to the potential reactivation of rail service on the corridor as a result of the taking, Bay and Preymore Streets can no longer be extended as Mr. Culverhouse originally planned because he cannot obtain an agreement to construct these roads across the Legacy Trail. Tr. 404. After the taking, the federal government controls the land underlying the corridor, and extending Bay or Preymore Street across the corridor would require agreement from the both the federal government and Sarasota County, and would carry the risk of costly modifications or even elimination of access should rail service return. Tr. 247-48, 404; see Caldwell v. United States, 391 F.3d 1226, 1229 (Fed. Cir. 2004) (citing Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd., 158 F.3d 135, 139 (D.C. Cir. 1998)).

To develop McCann North to the greatest allowable density as zoned, Sarasota County requires residential developments to have two access points, which must be at least 1,320 feet apart when on the same road. Tr. 139-40. Without access via Bay and Preymore Streets, access to McCann North was limited to Honore Avenue. Thus, to provide access at two locations as required by Sarasota County, Plaintiff needed to extend Honore Avenue. Tr. 142-43, 403-405. Mr. Culverhouse testified that he would not have extended Honore Avenue into McCann North, as has been done since the taking, if not for the Legacy Trail. Tr. 434-36. Instead, based on his understanding, the County would have extended Bay and Preymore Streets using the County's rights-of-way, and he would have obtained the required access via those streets. Tr. 442.

Mr. Durrance testified that extending Honore Avenue 1,320 feet would cost $1,155,000. Tr. 145, 175. Mr. Durrance based his cost determination on the cost of extending another portion of Honore Avenue 2,500 lineal feet in late 2004 and early 2005, which cost $875 per lineal foot. Tr. 144-45. Mr. Culverhouse testified that a similar road extension had cost $890 per lineal foot in 2004, without including a 15% engineering firm fee. Tr. 412.

Mr. Durrance included damages for lost access because he determined McCann North was limited to one point of access in the after condition, and a knowledgeable buyer would incorporate the cost of obtaining a second access point by extending Honore Avenue into the purchase price. Tr. 142-43. Plaintiff asserts the cost of extending Honore Avenue is a proper means of quantifying severance damages for the lost access, arguing: "at an absolute minimum (not including any reduction in market value attributed to the inferior access over Honore as

compared to Bay and Preymore), the loss of access to Bay and Preymore means the remaining land is less valuable by at least the $1.155 million cost to extend Honore." Pl.'s Post-Trial Br. 39.

Defendant contends that Plaintiff is not entitled to any compensation for loss of access. First, Defendant asserts that Plaintiff would have extended Honore Avenue, regardless of the taking. This argument is premised on the fact that Honore Avenue is a "spine road that runs through the Palmer Ranch development," and extending it would provide needed access to McCann South. Def.'s Post-Trial Br. 32 (quoting Tr. 67-68). Second, Defendant argues that McCann North did not abut Bay or Preymore Streets before the taking, and McCann North did not have access via Bay or Preymore Streets in 2004. Tr. 566-67.

Defendant's speculation that Plaintiff would have extended Honore Avenue is not supported by the evidence. First, there was no evidence that extending Honore Avenue was necessary to access McCann South, or that there were plans to develop McCann South. Second, access on the west was superior to access gained by extending Honore Avenue. Third, if Bay and Preymore had been extended, Plaintiff would have already had three access points, while the County only required two, making the extension of Honore Avenue unnecessary.

The Court recognizes that McCann North did not have actual western access via Bay and Preymore Streets before the taking. However, Mr. Culverhouse had the opportunity to obtain such access via the County's rights of way in the future, and the fair market value of a property can be based on a future circumstance. As the Supreme Court has recognized:

> The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the <u>possibility</u> of combination is reasonably sufficient to affect market value.

<u>Olson v. United States</u>, 292 U.S. 246, 255-56 (1934) (citations omitted) (emphasis added);  <u>see</u> <u>United States ex rel. TVA v. Powelson</u>, 319 U.S. 266, 275-76 (1943) ("[I]n order for that special adaptability to be considered, there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future.") (citing <u>Olson</u>, 292 U.S. at 255); <u>Narloch v. State</u>, 340 N.W.2d 542, 550 (Wis. 1983) ("[A] condemnee seeking severance damages due to a taking of access rights must establish a foundation that prior to the taking, there was a reasonable potential in the foreseeable future for developing his or her property in accordance with its highest and best use, and that this potential for development has been diminished because of the loss of access rights.").

Thus, even though Bay and Preymore Streets had not been extended at the time of the taking, potential access via these streets can be factored into the valuation analysis so long as there was a "reasonable probability" that the county would have extended these roads in the reasonably near future. <u>Powelson</u>, 319 U.S. at 275-76; <u>see also</u> <u>United States v. 161 Acres of Land</u>, 427 F. Supp. 582, 584 (D. Colo. 1977) (finding land should be appraised with the access it

had at the time of taking, plus the added value, if any, resulting from the probability of obtaining a permit from the Park Service to build an additional road).

The issue of whether future western access to McCann North via Bay and Preymore Streets was reasonably probable is a question of fact.  In Board of County Supervisors of Prince William County, Virginia v. United States, the Federal Circuit addressed the issue of reasonable probability of future land use in the context of determining whether a parcel of land could be appraised based on the potential of combining the land at issue with other parcels.  276 F.3d 1359, 1363 (Fed. Cir. 2002) ("Prince William County").  In Prince William County, the plaintiff argued the land should be appraised as assembled with surrounding lands and developed as a planned mixed-use development because such a use was reasonably probable, while the defendant argued that the land should only be valued as a road with no consideration of potential combination with other lands.  The trial court agreed with the plaintiff and held the highest and best use of the land was to assemble it with surrounding land and complete a mixed-use development, and the Federal Circuit affirmed.  The Federal Circuit concluded that there was sufficient evidence that it was reasonably probable the parcel could have been assembled with surrounding land, citing the following:

- Testimony from a neutral appraiser that he compared the acres at issue to ten nearby similar parcels that had been intended for use as roads but were subsequently sold to adjoining landowners, and

- Eight case studies presented by the neutral appraiser of development projects where land planned for a road was ultimately used for a different purpose.

Id. at 1365-66; see also United States v. 50.8 Acres, 149 F. Supp. 749, 752 (E.D.N.Y. 1957) ("To what extent the possibility or probability of a change would affect the value as of the date of taking is dependent upon the degree of probability, the imminence of the change, the effectiveness of the opposition, and other factors which are largely speculative and conjectural.") aff'd sub nom., United States v. Meadow Brook Club, 259 F.2d 41 (2d Cir. 1958); State Rds. Comm'n of the State Highway Admin. v. Kamins, 572 A.2d 1132, 1137 (Md. Ct. Spec. App. 1990) (stating, when the landowner relied on an appraiser's testimony as evidence of a future zoning change, "[w]e hold that this testimony, while far from overwhelming, was not so insubstantial that the trial judge erred in its admission or in allowing the jury to consider it.").

Here, Plaintiff has marshaled sufficient evidence to establish there was a reasonable probability that Sarasota County would have used its dedicated rights-of-way to extend Bay and Preymore Streets, which would have afforded access to McCann North at those two locations. Plaintiff proffered plats showing the County had dedicated rights-of-way and would not need to condemn private property to extend either street.  PX 18, PX 19.  Mr. Culverhouse credibly testified that based on his discussions with the county, he believed the county would have extended Bay and/or Preymore Streets:

> Q.     So what did you understand as of 1999 the condition was for Bay Street?

> A.     What I understood is I've testified before, I had an agreement in 1999 with the county that they had access.

> Q.      And this plat indicates, does it not, they actually had a deeded, dedicated access all the way?

> A.      Yes, sir, it does.

Tr. 442 (emphasis added).  Mr. Durrance also understood there would be potential access from Preymore and Bay Streets to McCann North, stating: "[f]urthermore, the new easements impose increased limitations on the remainder relative to potential access and exposure from Preymore Street and Bay Street."  PX 15 (BB-PLTF 04188).

The Court finds there was a diminution in the fair market value of the remainder because the imposition of the Legacy Trail completely foreclosed the possibility of western access, and a reasonable and knowledgeable buyer would likely have considered Sarasota County's access requirements and McCann North's impaired access to amenities west of the property in determining the property's fair market value.  See United States v. Va. Elec. & Power Co., 365 U.S. 624, 633 (1961) ("[The guiding principle of just compensation] can readily be served by the ascertainment of fair market value -- 'what a willing buyer would pay in cash to a willing seller.'") (quoting United States v. Miller, 317 U.S. 369, 374 (1943)).  Plaintiff has shown that the loss of access via Bay and Preymore Streets affected the value of McCann North, depriving the property owner of an expedient means to reach the beach, US Route 41, and Pine View School, a nationally-recognized school.  Tr. 138-39, 400.  Mr. Durrance testified that the route to reach these destinations via Honore Avenue would be four miles longer than it would have been using Bay or Preymore Streets.  Tr. 139.

Because of this diminution in fair market value due to loss of potential access, severance damages are appropriate.  As the Eighth Circuit stated:

> Where a public improvement makes access to one's property inconvenient, and makes it less accessible than it was before, even though the improvement is not upon or does not abut upon the land, the owner may recover as part of his damages, such loss in value as the resulting inconveniences and inaccessibility may have caused.

Union Elec. Light & Power Co. v. Snyder Estate Co., 65 F.2d 297, 311 (8th Cir. 1933) (citing United States v. Grizzard, 219 U.S. 180 (1911)); see Dep't of Transp. v. Stubbs, 285 So. 2d 1, 3 (Fla. 1973) ("Ease and facility of access constitute valuable property rights for which an owner is entitled to be adequately compensated."); see also Dep't of Transp. v. Whitehead, 317 S.E.2d 542, 545 (Ga. 1984) ("[A]ny such inconvenience [and circuity of travel] is clearly a consideration affecting the value of Whitehead's remaining property."); Comm'r of Transp. v. Van Nortwick, 670 A.2d 548, 556 (N.J. Super. Ct. App. Div. 1995) (finding diminished access was a proper consideration in determining compensation based on fair market value).

Plaintiff seeks $1,155,000, the cost to extend Honore Avenue 1,320 lineal feet, as severance damages for lost access.  It is well established that "[t]he burden of proof is upon the [plaintiff] to show entitlement to severance damages" and "strict proof of loss in market value of the remainder property is obligatory."  Miller v. United States, 223 Ct. Cl. 352, 383-84 (1980). Plaintiff based the amount claimed for lost access on the cost of extending Honore Avenue 1,320 lineal feet at a cost of $875 per lineal foot.  Tr. 145.  Mr. Durrance used $875 per lineal foot as

the cost to extend the road because that was the actual cost to extend another segment of Honore Avenue 2,500 feet in late 2004 to early 2005. Tr. 144-45. The cost of constructing a road to provide access can constitute the measure of severance damages for lost access. See United States v. 711.57 Acres, 51 F. Supp. 30, 33 (N.D. Cal. 1943) (finding the cost of constructing a road to provide an alternate means of access would "fairly compensate the defendant for depreciation in value of the severed tract").

Defendant argues, however, that Plaintiff cannot recover the cost of extending Honore Avenue because Plaintiff characterized this element of damages as a "cost to cure" and failed to demonstrate that the claimed $1,155,000 was less than the diminution in value to the McCann North remainder stemming from lost access. Def.'s Post-Trial Br. at 27-28. As explained above, Defendant is correct that cost-to-cure damages cannot exceed the diminution of the remainder's fair market value -- necessitating that a plaintiff claiming cost-to-cure damages establish what the diminution in value of the remainder was. 2.33 Acres of Land, 704 F.2d at 730; Dickinson, 152 F.2d at 870; 4A Nichols on Eminent Domain § 14A.04[2]. Here, Plaintiff never separately quantified the diminution in the value of McCann North due to lost access or compared it to the cost of extending Honore Avenue. However, it appears that Plaintiff has characterized the compensation it seeks for loss of access both as a separate component of severance damages measured by the cost of extending Honore Avenue and as a "cost to cure." Pl.'s Post-Trial Br. 15, 38-39.

The Court does not view what appears to be an imprecise labeling of the type of damages Plaintiff seeks to be an impediment to recovery here. Indeed, Plaintiff's expert did not characterize Plaintiff's claimed cost of extending Honore Avenue as a "cost to cure." Rather, Mr. Durrance testified that the McCann North remainder was at least $1,155,000 less valuable because the trail severed access to Bay and Preymore and Honore Avenue needed to be extended. Tr. 142-43. So too, in the majority of reported instances where a plaintiff has sought severance damages for loss of access, such damages have not been denominated as a cost to cure. See, e.g., Union Elec. Light & Power Co., 65 F.2d at 311 (stating a jury should consider diminished access as an element of damages when determining severance damages); 711.57 Acres, 51 F. Supp. at 33 (awarding $8,000 in severance damages for lost access); Stubbs, 285 So. 2d at 3 ("Ease and facility of access constitute valuable property rights for which an owner is entitled to be adequately compensated."); Whitehead, 317 S.E.2d at 545 (holding recovery for severance damages based on lost access was proper); Van Nortwick, 670 A.2d at 556 (upholding jury instruction to consider lack of access as severance damages only if it was actual and specific to the property); 4A Nichols on Eminent Domain § 14.04[2][b] ("A landowner is entitled to reasonable access to his or her property. If a partial taking denies the landowner . . . reasonable access, this impairment of access is an element to consider in calculating severance damages."). But see Shelby Cnty. v. Kingsway Greens of Am., Inc., 706 S.W.2d 634, 638-39 (Tenn. Ct. App. 1985) (finding the record could not support awarding the cost of providing alternative access as a "cost to cure" when there was no proof in the record concerning the diminution in value of the property).

Construing Plaintiff's claim for severance damages consistent with its expert's testimony and the majority of legal authorities on loss of access, this Court concludes that the cost of extending Honore Avenue is properly characterized as a separate component of severance damages due to loss of potential access as a result of the taking -- not as a cost to cure. As such,

Plaintiff need not separately prove the diminution in value of the remainder, or that such diminution exceeds the cost to cure.  Rather, the diminution in value due to loss of potential access can be measured by the cost of extending Honore Avenue.  Union Elec. Light & Power Co., 65 F.2d at 311; 711.57 Acres, 51 F. Supp. at 33; Stubbs, 285 So. 2d at 426; Whitehead, 317 S.E.2d at 545; Van Nortwick, 670 A.2d at 556.  This claimed cost of $1,155,000 is reasonable and supported by the evidence.  Accordingly, Plaintiff is awarded $1,155,000 in severance damages for lost access.

### Conclusion

The Clerk is ordered to enter judgment awarding Plaintiff just compensation in the amount of $3,177,365, representing $1,267,200 for the encumbrance plus severance damages of $755,165 representing the cost to cure the harm to the property adjacent to the trail, and $1,155,000 for lost access.

The Court does not determine what rate of interest should be applied as the parties have filed cross-motions for summary judgment on that issue.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

## Appendix A



DX 1 (US Ex. 000001-028).